IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2007 Session

## STATE OF TENNESSEE v. NICHLOUS MAXWELL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08392     James C. Beasley, Jr., Judge**

---

**No. W2006-01213-CCA-R3-CD  - Filed October 15, 2008**

---

Following a jury trial, Defendant, Nichlous Maxwell, was convicted of second degree murder. He was sentenced to twenty-five years' incarceration. On appeal Defendant argues (1) the trial court committed reversible error by permitting the prosecutor to elicit a hearsay statement under the excited utterance exception to the hearsay rules, (2) that the trial court erred in its response to jury questions regarding the instruction on criminal responsibility for the conduct of another, and (3) the trial court erred in enhancing Defendant's sentence based on facts not found by a jury. After a thorough review of the record, we affirm the judgments of the trial court as to the hearsay statements and the jury instruction and modify the judgment as to sentencing from twenty-five to twenty-three years.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed in Part and Modified in Part**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Lorna S. McClusky, Memphis, Tennessee, for the appellant, Nichlous Maxwell.

Robert E. Cooper, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Lee Coffee, Assistant District Attorney; and Stacey McEndree, Assistant District Attorney, for the appellee, the State of Tennessee.

### OPINION

### I.  Background

        In the early morning hours of May 26, 2003, Prentice Moore (also known as "Twin One") was shot and killed in the parking lot of an Exxon gas station in Memphis. Earlier that morning, Defendant and the victim were involved in an altercation at the Denim and Diamonds nightclub. Gregory Livingston, the director of security for the club, was summoned to the security office via portable radio after one of his employees reported a fight that had occurred at the pool tables. When

Mr. Livingston arrived at the office he found the victim and his twin brother, Prenston Moore (also known as "Twin Two") there. Mr. Livingston found the twins to be agitated and upset. When Mr. Livingston asked the twins what happened, the victim responded that "some other guys jumped him and his brother." The victim also informed Mr. Livingston that Defendant said he was going to kill them. Because the twins were concerned for their safety, the security guards escorted them out of the building about thirty minutes after the fight occurred.

Prenston Moore testified that the problems between the victim and Defendant began in October 2002 when Defendant poured a beer on the victim's girlfriend. This caused a fight between the victim and Defendant at the nightclub. The fight was broken up by security and both men went on their way. The victim and Prenston Moore did not see Defendant again until the night of May 25, 2003 at the nightclub. When Prenston Moore, the victim, and their friends were leaving the club in the early morning hours of May 26, 2003, they walked past Defendant. Prenston Moore testified that he heard Defendant say he was "dumping n-----s." Prenston Moore stated that this statement was slang for killing someone. After this comment, the victim began fighting with Defendant. Prenston Moore joined the fight and hit Defendant several times with a pool cue and then chased him out of the nightclub.

After being escorted out of the club by security, the victim, Prenston Moore, and their cousin, Pat Grant, drove to a nearby Exxon station. The victim was driving the car, while Prenston Moore was in the backseat and Mr. Grant was in the front passenger seat. After circling the Exxon parking lot twice, the men stopped in the parking lot. Very soon after parking, Prenston Moore heard shots fired. The victim reached in the backseat and pushed Prenston Moore's head down. At this point, Prenston Moore felt blood fly into his face and he thought he had been shot. Within a few seconds, however, he realized that it was the victim who had been shot. Prenston Moore looked to the back of the vehicle and saw a bullet hole. Prenston Moore also saw a person he identified as Defendant running away from the rear of the car. Prenston Moore testified that Defendant was carrying an assault rifle. Prenston Moore stated that he did not see anyone with Defendant and that, even though Defendant had something covering part of his face, he recognized Defendant by his bald head. During the incident, Prenston Moore heard three or four shots fired and testified that all the shots were fired from the rear of the vehicle. After the shots stopped, the victim "pulled off" the lot onto Mendenhall and hit another car. The victim was able to drive a short distance further to Cottonwood and then "fell back." Prenston Moore grabbed the wheel and managed to stop the car. Once the car was stopped, Prenston Moore pulled the victim out of the car and covered him up.

Edward Reynolds, Omar Edwards, and Roy Washington were friends of the victim and were with him at the nightclub that night. Mr. Reynolds and Mr. Edwards saw the fight between the victim, Prenston Moore, and Defendant. Mr. Reynolds, Mr. Edwards, and Mr. Washington left the club after the fight in Mr. Edward's white Tahoe. The men also drove to the Exxon station and circled the parking lot. They then pulled up next to a gas pump, and the victim was on the other side of the same gas pump. Mr. Reynolds looked back and saw Defendant holding an assault rifle. Mr. Edwards saw Defendant carrying a gun with a "banana clip." Mr. Washington saw Defendant carrying a "machine gun with a long clip." All three men acknowledged that Defendant had something covering part of his face, but they could tell the Defendant was bald. None of the men saw another person with Defendant. Mr. Reynolds saw the victim push Prenston Moore's head

down before he was shot. Mr. Edwards saw a bullet "knock out" the back window. Mr. Washington saw a bullet strike the victim.

Bryan Cohran was also at the Exxon station early that morning. Mr. Cohran was not a friend of the victim or Defendant, but was "relieving himself" behind the Exxon station when he saw Defendant and a taller, lighter complected man run towards the victim's car and start shooting. Mr. Cohran noticed that the Defendant had an assault rifle and the other man had a handgun. Mr. Cohran saw shots fired from the rear of the victim's vehicle. After Defendant and the other man fired several shots, they ran back the way they came, and someone in a green Tahoe started shooting at them.

Inside the green Tahoe were Tim Scott and Larry Moore. Mr. Scott had followed the victim and Mr. Edwards from the club to the Exxon. When they arrived, they could not find a parking space and were waiting for someone to leave when they saw two men come around the building. Both men testified that the bald man (identified as Defendant) was carrying an assault rifle and the other man was carrying a handgun. Both men also testified that the man carrying the assault rifle had gold teeth. At trial, Defendant demonstrated for the jury that he has gold teeth. Larry Moore testified that he saw Defendant fire several shots and that he saw the other man shoot. Larry Moore also saw the victim push Prenston Moore's head down before he was shot. Mr. Scott began shooting at Defendant and the other man once he realized what was happening.

Fredrick Rodgers also witnessed the fight at the club and the shooting at the Exxon. He saw Defendant carrying an assault rifle and fire into the back of the victim's car. Mr. Rodgers also stated that there was another man with Defendant and that he recognized Defendant because of his gold teeth.

Several members of the Memphis Police Department testified for the State. Officer David Payment testified that he investigated the area at Cottonwood and Mendenhall where the victim's car came to a stop as well as the Exxon station where the shooting occurred. At the Cottonwood scene Officer Payment recovered a spent nine millimeter shell casing (fired into the air by Mr. Grant when a car drove by after Prenston Moore had pulled the victim out of the car) and a live nine millimeter bullet near the victim's car. He also recovered a nine millimeter handgun from the victim's car. Prenston Moore testified that the victim carried a gun in his car. At the Exxon station, Officer Payment recovered three spent 7.62 x 39 shell casings, four spent nine millimeter shell casings, and a nine millimeter bullet fragment on the front dash of the victim's car. Officer Payment also testified that the front windshield of the car had a bullet hole in it, although he was unable to testify as to whether the bullet hole was an entrance or exit hole. Sergeant James Fitzpatrick testified that he observed two bullet holes in the rear window of the victim's car. In Sergeant Fitzpatrick's opinion, the bullet fragment found on the front dash came from the rear of the vehicle, hit and passed through the victim, struck the front windshield, and then "lost its power and bounced back."

Sergeant John Palsey identified Defendant as a suspect. Several eye witnesses identified Defendant in a photo spread and also mentioned another man named either Terrell or Chris. The officers were not able to positively identify this person, although they did confirm that there were nine millimeter shell casings found at the Exxon station consistent with a second shooter.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, performed the autopsy on the victim's body. Dr. Smith determined that the victim was killed by a high velocity gunshot wound that entered through his right eye and exited through the back of his head. Typically, an example of a high velocity gun is an assault rifle, and a handgun is not a high velocity weapon.

Monica Allen, Defendant's girlfriend at the time of the shooting, testified on his behalf. Ms. Allen testified that she saw the fight at the club and saw Defendant run out of the club. Ms. Allen testified that she left a short time later after "the crowd cleared out." When Ms. Allen arrived home, Defendant was there with injuries sustained from the fight. She testified that she gave him a rag to clean himself with and then they both went to bed. She was unsure of the time they went to bed but guessed it was around three o'clock in the morning. Ms. Allen also agreed on cross-examination that because she was asleep she did not know if Defendant left during the night, even though he was there when she woke up the next morning.

## II. Analysis

Defendant argues on appeal that the trial court committed reversible error by permitting the prosecutor to elicit a hearsay statement under the excited utterance exception to the hearsay rules, that the trial court erred in its response to jury questions regarding the instruction on criminal responsibility for the conduct of another, and the trial court erred in enhancing Defendant's sentence based on facts not found by a jury.

### A. The Hearsay Statements

The issue of whether the admission of hearsay evidence violated a defendant's rights under the Confrontation Clause is purely a question of law. *State v. Maclin*, 183 S.W.3d 335, 342 (Tenn. 2006) (citing *Lilly v. Virginia*, 527 U.S. 116, 125, 119 S. Ct. 1887, 1894, 144 L. Ed. 2d 117 (1999)), *abrogated on other grounds as stated in State v. Cannon*, 254 S.W.3d 287 (Tenn. 2008). The application of the law to the facts found by the trial court is a question of law that this Court reviews *de novo. Id.* at 343 (citing *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *Beare Co. v. Tenn. Dept. of Revenue*, 858 S.W.2d 906, 907 (Tenn.1993)).

In the instant case, the statement at issue was determined by the trial court to be an excited utterance and therefore admissible under Tennessee Rule of Evidence 803(2). The statement at issue occurred after the victim and Prenston Moore were brought to the security office following a fight with Defendant. Mr. Livingston, the head of security, was called to the office about four minutes after the fight and the twins told him what happened. The victim told Mr. Livingston that Defendant had "threatened to get a gun and kill them." Mr. Livingston stated that Prenston told him the same thing.

Defendant contends that the statement first violated the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). However, we conclude that Defendant has waived any objection to Mr. Livingston's testimony on the ground that it violates *Crawford* because he failed to raise this objection at trial and in his motion for a new trial. *See* Tenn. R. App. P. 3(e). Our rules of appellate procedure provide that an issue may not be raised

for the first time on appeal. Tenn. R. App. P. 36 (a). As such, Defendant's failure to raise this objection either at trial or in his motion for new trial precludes him from doing so now. However, even if not waived, we find no error in the admission of the challenged statement.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This amendment was made applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067, 13 L. Ed. 2d 923 (1965). Additionally, the Tennessee Constitution Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9.

In *Crawford*, the Supreme Court, in determining the admissibility of hearsay evidence within the constraints of the Confrontation Clause, recognized that the right to confront one's accuser is not absolute. *See Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. The Court concluded that the Confrontation Clause was only intended to protect a defendant from testimonial hearsay statements, not all statements that are hearsay. *Id*. In rejecting a bright-line "testimonial" definition, the *Crawford* Court nonetheless provided guidance by providing three examples or "formulations" which qualify a hearsay statement as "testimonial:"

> (1) ex parte in-court testimony or its functional equivalent such as affidavits, custodial examinations, prior testimony which a defendant was unable to cross-examine, or similar pre-trial statements which declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions; and (3) statements made under circumstances which would lead an "objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52, 124 S. Ct. at 1364. The Court noted that, at a minimum, the term "testimonial statements" applied to police interrogations and "[s]tatements taken by police officers in the course of interrogations." *Id*. at 52; 124 S. Ct. at 1364. In contrast, the Court noted that a casual comment to an acquaintance, business records, or statements in furtherance of a conspiracy are not testimonial. *Id*. at 51, 56, 124 S. Ct. at 1364, 1367. The Court in *Crawford* reaffirmed that the standard to be applied for determining admissibility of non-testimonial hearsay remained the standard articulated in *Ohio v. Roberts*, which permitted admission of an unavailable witness' statement against a defendant if the statement bore "adequate 'indicia of reliability.'" *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374; *Ohio v. Roberts*, 448 U.S. at 66, 100 S. Ct. at 2539.

The Tennessee Supreme Court, following the decision of *Crawford*, held that a testimonial statement "involves a formal or official statement made or elicited with a purpose of being introduced at a criminal trial." *Maclin*, 183 S.W.3d at 346. The court noted that the implication of *Crawford* "is that statements made to police while they are performing an 'investigative and prosecutorial function' are testimony." *Id*. "The common denominator in . . . determining whether a particular statement to a police officer is 'testimonial' is whether the declarant was acting in the role of a 'witness' at the time the statement was made." *Id*. at 348-49.

However, since our Supreme Court's decision in *Maclin*, the Supreme Court has issued two later opinions interpreting *Crawford*. In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), and its companion case, *Hammon v. Indiana*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) the Court departed from *Roberts*, concluding that only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause" and determining that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. 126 S. Ct. at 2273, 126 S. Ct. 2266. In *State v. Lewis*, 235 S.W.3d 136 (Tenn. 2007), our Supreme Court held, "the ruling in *Davis* that the Confrontation Clause is inapplicable to nontestimonial hearsay conflicts with our interpretation in *Maclin* that the *Roberts* test should be used to determine the admissibility of nontestimonial hearsay." *Lewis*, 235 S.W.3d at 143. Our Supreme Court went on to quote the difference between testimonial and nontestimonial hearsay as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id*. at 144 (quoting *Davis*, 126 S. Ct. at 2273-74).

Our Supreme Court then determined that, like the federal constitution, the Tennessee Constitution does not require that nontestimonial hearsay be analyzed under *Roberts*. *Id*. at 145. The Court held that when hearsay evidence is nontestimonial and falls within one of the exceptions under the Rules of Evidence no additional analysis is needed. *Id*.

When analyzing the statement in the instant case under *Crawford* and *Lewis*, we must determine if the statement that was admitted was testimonial in nature. Because Mr. Livingston was not a law enforcement officer, the statement was not elicited for the purposes of prosecution, and because the statement was elicited in order to address an ongoing emergency situation, it was not testimonial. Mr. Livingston stated he was the head of private security hired by the club, not a police officer. He also stated that to his knowledge no police were never contacted about the fight or the threat made by Defendant. Lastly, because Mr. Livingston did not know where Defendant was after the fight, it was necessary for him to determine what happened in order to protect the twins and the other people in the club from another fight or emergency situation. Because the statements were nontestimonial, there is no *Crawford* issue, and Defendant is not entitled to relief.

Defendant next contends that even if the statements were deemed to be nontestimonial, that admission of them violated the Tennessee Rules of Evidence. Tennessee Rule of Evidence 803(2) states an exception to the hearsay rule as, "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In the instant case, the statements made by the twins were made just a few minutes after the fight (the startling event) occurred. Mr. Livingston testified that he knew the twins well and that he could tell they were agitated, upset, and scared. He stated that their voices were raised and they were talking

-6-

very fast. The trial court determined that "it would qualify as an excited utterance under the circumstances. It was close in time to the incident involved. Emotions are still high . . ." We conclude that the trial court did not err in allowing Mr. Livingston to testify as to the excited utterances made by the victim and Prenston Moore. Accordingly, Defendant is not entitled to relief as to this issue.

### B. Jury Instruction on Criminal Responsibility

Defendant next contends that the trial court erred in its instruction to the jury as to criminal responsibility and in its response to a jury question regarding criminal responsibility. Defendant expressed concerns with the criminal responsibility instruction during a jury out hearing at trial. Defendant's concerns involved the possibility that the jury would determine that Mr. Scott was responsible for the victim's death. The trial court responded as follows:

> There's got to be proof that [Defendant] would be criminally responsible for Mr. Scott if the jury believes that. They've got to have some proof that he was criminally responsible for Mr. Scott's actions.
>
> . . .
>
> I mean, the proof is completely devoid of anything that would indicate that he could be held criminally responsible for Mr. Scott.

The trial court then went on to instruct the jury on the criminal responsibility statute in the jury instructions. After the jury had begun deliberations they presented the trial court with three questions regarding criminal responsibility. The jury asked

> 1. Can you explain criminal responsibility to us?
>
> 2. If someone did it & and [Defendant] did not know until after the fact[,] is he still guilty because he benefitted?
>
> 3. Is the indictment accusing [Defendant] of being the actual shooter or can we find him guilty if we believe he is criminally responsible?

The trial court held a jury out hearing to discuss with the State and Defendant the appropriate answer to these questions. During the hearing, Defendant asked that the judge instruct the jury to make a specific finding of fact whether it found Defendant guilty on the basis of criminal responsibility of another.

Defendant asked that the jury be sent a form that listed the options for indicating the person whose conduct Defendant was found to be criminally responsible for. Defendant argues that if the jury found that Defendant was criminally responsible for the actions of Mr. Scott then they "are in the wrong place on criminal responsibility." The trial court determined that while Defendant's argument was "novel," it was not willing to comply because to do so would be an impermissible

-7-

comment on the evidence. The trial court, instead, decided to reread the criminal responsibility instruction to the jury. The trial court then brought the jury in and reread the instruction. The trial court also explained that "that is the only answer I'm allowed by law to give you. Any other specific answers would be a comment on the evidence, which the law does not permit me to do." An hour later, the jury returned a verdict of guilty of murder in the second degree.

When the trial court's instructions to the jury correctly, fully, and fairly state the applicable law, it is not error to refuse to give a special requested instruction. *State v. Inlow*, 52 S.W.3d 101, 107 (Tenn. Crim. App. 2000); *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). While Defendant did not specifically ask for a special instruction in the instant case, the trial court did not err in refusing to give the jurors the form Defendant suggested. This court must review the entire jury charge; we can find error only if, when read as a whole, the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Further, the trial court did not err when it responded to the jury questions by rereading to them the charge for criminal responsibility, and the trial court was correct in stating that it was impermissible for it to comment on the evidence. Accordingly, Defendant is not entitled to relief as to this issue.

C. Sentencing

We note that the legislature has recently amended several provisions of the Sentencing Reform Act of 1989, which became effective June 7, 2005. However, although Defendant was sentenced after the effective date of the amended Act, Defendant's crime in this case occurred prior to June 7, 2005, and Defendant did not elect to be sentenced under the provisions of the amended Act by executing a waiver of his ex post facto protections. *See* 2005 Tenn. Pub. Acts ch. 353 § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

Defendant was sentenced to twenty-five years for his second degree murder conviction. A person convicted of second degree murder, a Class A felony, faces fifteen to twenty-five years in prison. The presumptive sentence is twenty years.

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim.

App.1995). The defendant bears the burden of showing that his sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The sentencing hearing in this case was held on March 8, 2006. In *Blakely*, the United States Supreme Court concluded that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 124 S. Ct. at 2536 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)). In *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), the Supreme Court held "[b]ecause circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt . . . [California's sentencing scheme] violates *Apprendi's* bright-line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Cunningham*, 549 U.S. at ___, 127 S. Ct. 856. (citing *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2348).

Our Supreme Court has concluded that other than a defendant's previous history of criminal convictions or criminal behavior admitted to by the defendant, the application of enhancement factors which increases the defendant's sentence over the statutorily presumptive sentence deprives the defendant of his or her Sixth Amendment right to have a jury determine whether those enhancement factors applied. *State v. Gomez*, 239 S.W.3d 733, 739-40 (Tenn. 2007) (citing *Cunningham*, 127 S. Ct. at 860).

The trial court found five enhancement factors that it felt made the twenty-five year sentence appropriate. The trial court based the enhancement on: the fact that Defendant did have a prior criminal record, that Defendant was a leader in the commission of a felony involving two or more criminal actors, that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community, that Defendant possessed a firearm during the offense, and that Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(2), (3), (9), (10), (11). The court found one mitigating factor being that Defendant "assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses." T.C.A. § 40-35-114(9). However, the trial court also determined that this mitigator should not be given much weight and did not "come anywhere close to off-setting, or over-coming the enhancement factors that have been found."

The State concedes that under *Gomez*, the trial court erred in enhancing Defendant's sentence based on enhancement factors, other than criminal history or behavior, not found by a jury. However, the State contends that because of Defendant's criminal history the enhancement from twenty years to twenty-five years is still valid.

Defendant's criminal history consists of six misdemeanor drug possession convictions, one evading arrest conviction, two driving with a suspended license convictions, and one simple assault conviction. His convictions date from 1997 through 2000. The trial court during sentencing stated,

"I do find that [Defendant's criminal history] is a factor and I am going to put a great deal of emphasis on the continual violation of law by [Defendant] . . . The Defendant has been . . . previously placed on probation and has, again, violated that probation, which shows a lack of respect . . . I do find that there is a history of unwillingness to comply with conditions of a sentence involving release in the community." While, the trial court clearly placed a great deal of emphasis on Defendant's criminal history as a reason for the enhancement, it also placed a great deal of emphasis on the other enhancement factors. A modification is thus necessary. Accordingly, we modify Defendant's sentence from twenty-five years to twenty-three years.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed as to all issues except the use of enhancement factors in the sentencing of Defendant. As to sentencing, the we modify the sentence from twenty-five to twenty-three years based on Defendant's criminal history.

_____

THOMAS T. WOODALL, JUDGE